**SMITH v. GULF, C. & S. F. RY. CO. et al.**
(No. 3739.)

Court of Civil Appeals of Texas. Texarkana.
Dec. 26, 1929.

Rehearing Denied Jan. 9, 1930.

Dee Estes and Mike E. Smith, both of Fort Worth, for plaintiff in error.

Lee, Lomax & Wren, of Fort Worth, W. P. Donalson, of Dallas, and Terry, Cavin & Mills, of Galveston, for defendants in error.

LEVY, J. The suit was by the plaintiff in error in her own behalf and as next friend of her minor son, to recover damages for the alleged negligence causing the death of A. P. Smith. About 6 o'clock p. m. of December 28, 1929, A. P. Smith fell down into a railway excavation or subway and was killed. The excavation or subway was on the property of the railway company and near and paralleling De Soto street in the city of Dallas. The grounds of negligence alleged are, name-

ly: (1) Maintaining the excavation or subway "open, unguarded, unlighted and unprotected," constituting it "a dangerous structure, agency or pitfall calculated to cause injury to one lawfully in and about the said public street and premises;" and (2) the watchman "kept and maintained" by the railway company, and "authorized and empowered generally to look after the buildings, premises and subway," "invited the deceased to come to the place on the premises where he, the said watchman, was standing, and without warning him of the subway," and "the said A. P. Smith, relying thereon and without notice or knowledge of the existence of said subway, started in that direction, and as he did so stepped or fell into the same and was thereby injured, from which injuries he thereafter died." After hearing the evidence, the court peremptorily instructed the jury to return a verdict in favor of the defendants in error, and this appeal is to revise the action of the court in so doing.

██ It is believed that the evidence conclusively established, and warranted the trial court in holding, as he did, as a pure matter of law, that the unfortunate death of Mr. Smith was not due or ascribable to any negligence on the part of the defendants in error such as the first alleged ground was based upon. Lineburg v. City of St. Paul, 71 Minn. 245, 73 N. W. 723. It was shown that in furtherance of an industrial track in the city of Dallas the railway company had excavated a cut, or subway, in which the track was placed and maintained, paralleling De Soto street on the west for a distance of 1,000 feet or more from the intersection of Young and De Soto streets. The subway was upon the property of the railway company. At a point 272 feet from the west curb line of Young street the subway connected with and led into a tunnel running easterly under and across Young street and continuing thence to the Santa Fé building. The place where the deceased fell down into the subway was 151 feet from the mouth of the tunnel. The subway at this place was 18 feet wide and 21 feet deep. It had concrete retaining walls 8 inches thick from the bottom to the top, and which extended 12 inches above the level of the ground or surface of the street. Between the retaining wall and De Soto street proper there was a gutter 4 feet in width. The west wall of the gutter was also the east retaining wall of the subway. De Soto street was 40 feet wide. On the top of the concrete retaining wall of the subway, and parallel to De Soto street, was erected and maintained a wire fence 3 feet high. Commencing at the mouth of the tunnel the fence ran some 1,000 feet along De Soto street. The fence consisted of 2-inch pipe as posts, 10 feet apart, set in the concrete 3 feet deep when the retaining wall was laid. On the top of the posts was laid and securely fastened a 2-inch pipe. Heavy netting wire, known by the name of "Paige High-

way," was placed and securely fastened on the posts, reaching from the bottom to the top rail. The top of the fence was 4 feet above the level of the ground or the bottom of the gutter. No one saw the deceased fall down the subway. He was last seen standing on the street, just north of his automobile and about 4 feet east of the fence. His companion and the night watchman heard the body strike the bottom of the subway, and then discovered him lying there. These facts are undisputed. It is definitely proven by such testimony that the defendants in error did not, as alleged, either leave the side of the cut or subway next the street "open, unguarded and unprotected," or fail to use ordinary care to erect a sufficient fence or guard rails along the edge of the cut or subway to protect those using the street against danger. The fence that was erected and maintained was substantially built of steel and wire and was 3 feet above the top of the retaining wall of the subway, and the retaining wall extended 1 foot above the bottom of the 4-foot gutter. A substantial steel wire netting fence 4 feet high above the gutter or surface of the street may reasonably be regarded as sufficient as a barrier to protect pedestrians on the street from the subway. A fence or barrier 4 feet high would be more than two-thirds the height of a man who is as much as 5 feet 8 inches tall and is standing on the level surface of the ground. In common experience the man would not reasonably become overbalanced and fall over into the subway merely because of the striking of his body against such character of fence. Even if the man be as much as 6 feet tall, the danger of his being overbalanced and falling over into the subway is quite unlikely in case he comes in contact with the fence, standing on the level surface of the gutter. The circumstances fairly point to the fact that the deceased did not by suddenly walking against the fence become overbalanced and fall headlong into the subway, but that he either attempted to climb over the fence or to get on the retaining wall and then jump over the fence, landing in the subway. The circumstances go to reasonably show that he landed in the subway on his feet, and that he did not fall headlong therein. The agreed description of the injuries sustained by the deceased, as appears in the record, reads: "No external evidence of injury. Fracture in region of hip. Liver dislocated, and death as result of internal hemorrhage." The height and substantial build of the fence having served the purpose of giving notice to the deceased that 'in going beyond it he was leaving the thoroughfare, the absence of any special lighting was immaterial. Coming in contact with the fence, as deceased must have done, rendered it unnecessary that its outline be made clearly visible to the naked eye, and therefore negligence may not be predicated upon the alleged simple failure to have lights in the subway.

■■ By the second alleged ground of negligence, liability is sought to be based upon the fact that the deceased entered upon the premises of the railway company, believing it to be safe to do so, upon invitation or inducement of the watchman, who was authorized and empowered to look after the premises and the subway. The following circumstances were shown by the plaintiff:

The witness Kakos testified: "I was in Dallas on that date with Mr. Smith. We left Dallas at six o'clock from Main Street at the Singer Sewing Machine Company's office, in my Ford roadster. We were going back home to Waxahachie. We came next to Young Street, and came a block down Young Street and then got off Young Street because of the heavy traffic, and got on another street—De Soto Street. It was muddy, and we couldn't make it very far up that street. We came close to a big hoisting shovel in the street, and we couldn't get through the street. It was in the way, and the ground was very muddy. Mr. Smith said, 'You can't make it over there.' Mr. Smith then got out of the car and pushed it while I backed it. We started to back to get out on the same route we came in on. At the time I backed the car it slipped and went off in the ditch (gutter). There was a fence about two feet away, and the street was being worked. Mr. Smith said, 'Oh, stop!' and I stopped the car and got out. He and I tried to lift the car out of the mud, but we couldn't do it. I then said to him, 'We'll have to find something or some one to help us lift the car out.' He said, 'All right; let's go' to Young Street to see somebody or find something to raise the car out of the mud. At that time we saw a man with a flash light. He turned it on us from the other side (of the subway). He hollowed, 'What's the matter?' I then stopped Mr. Smith and said, 'Wait, Mr. Smith; maybe some one will come and help us get it out.' We stopped and waited for the fellow to come closer and help us. When he came up closer to where we were he stopped. Mr. Smith asked him if he could get anything around there to raise the car up with, and the man says, 'I don't know. If you will come around here maybe you will find something.' Mr. Smith then started walking, and I next heard something fall. The watchman on the other side said, 'What's the matter over there?' I said, 'Nothing is the matter.' He said, 'Well, somebody fell in there.' I said, 'There is nothing to fall in.' He said, 'Yes sir, there is a place to fall there —something to fall in.'"

The watchman testified: "I was night watchman for the railway company. I watched the freight-house and merchandise. My duties were to watch the freight-house and the cars in the yard there. It was my duty to watch over everything of the railroad company's. People are not allowed to go in around those tracks to prowl around there. * * * I recall the instance of an accident where a man named Mr. A. P. Smith went into that ditch (subway). I saw and talked to him before he fell in it. He was on the east side of the subway, some five steps from the concrete wall. On the subway wall was a wire fence three or four feet high. When I first saw Mr. Smith he and Mr. Kakos were near an auto. I saw they were having trouble to start the auto, and I just walked up near the subway and asked them what they were trying to do. The reply was, 'We're trying to turn our car around.' I said, 'It looks like you are getting in good shape to go off into this tunnel.' So I flashed my light down in the tunnel. Mr. Smith then asked me if I knew where he could get a piece of timber to pry the car out of the mud. I motioned with my arm and told him he might get one at the Dallas Storage & Warehouse Company, and I said, 'We'll see if we can find one.' I told him to go around (on Young Street), and motioned with my arm. I then turned to walk away, and I heard some object hit the bottom of the subway. I flashed my light down there and saw a man there. * * * I was the night watchman in the yards, and it was my business to watch the cars and the station house against pilferage and plunder. So far as this tunnel or subway was concerned, it was not under my jurisdiction. I did not have anything to do with that. As far as my duties as watchman for the railway company, I had absolutely nothing to do with a man on De Soto Street whose car was bogged in the mud. Whatever I did in helping him out in that situation I did as a man."

It was testified that if deceased, instead of crossing over the fence, had "gone down around the side of the tunnel toward the Dallas Storage & Warehouse Company, he would have crossed at a place (Young Street) where the tunnel was covered and could have come over on a perfectly straight way without any danger whatever." The Young street crossing was 151.3 feet distant from the place where Mr. Smith fell into the subway. Such circumstances were clearly sufficient to show that Mr. Smith was not entering upon the premises of the railway company for a purpose in any way connected with its business or in the interest or mutual advantage of Mr. Smith and the railway company. His object in going upon the premises of the company was merely for the benefit of himself, namely, to find "a piece of timber to pry the car out of the mud." The circumstances further definitely show that Mr. Smith in entering upon the company's premises for such purpose was not doing so by invitation or inducement on the part of the company, or on its responsibility. The watchman was acting, not as the authorized representative of the railway company, but purely on his own individual responsibility, in informing Mr. Smith that "if you will come around here maybe you will find something" (meaning a piece of timber).

504

The watchman's testimony was undisputed and unchallenged that "I was the night watchman in the yards, and it was my business to watch the cars and the station house against pilferage and plunder," and that "so far as the tunnel or subway was concerned, it was not under my jurisdiction; I didn't have anything to do with that." The plaintiff offered the watchman's evidence and is therefore concluded by it. 23 C. J. p. 50; Baker v. Cook, 13 Tex. 80; Texas & N. O. R. Co. v. Patterson & Roberts (Tex. Civ. App.) 192 S. W. 585, 587. The evidence does not show liability on the part of the railway company. Galveston Oil Co. v. Morton, 70 Tex. 400, 7 S. W. 756, 8 Am. St. Rep. 611.

It cannot in any reasonable view of the evidence be said that the watchman contemplated or intended for Mr. Smith to climb over the fence on the wall of the subway in order to pass into the premises of the railway company in search of a piece of timber. The watchman meant to inform him that he could "come around here," meaning on the west side of the subway, by going down to and across Young street. The crossing at Young street was admittedly a safe and secure way by which to pass over to the west side of the subway. But assuming that it can be justly said that the words of the watchman, "If you will come around here maybe you will find something," induced the deceased to believe that he could safely cross over the fence, yet the liability of the railway company cannot be rested on this fact, for the watchman in so inducing deceased was, as proven, not acting as agent or representative or within authority conferred upon him by the railway company.

After carefully reviewing the record, the members of this court are of the opinion that the trial court did not err in giving the peremptory instruction complained of, and that the judgment should be affirmed; and it is accordingly so ordered.